UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHEAN SATGUNAM,

            Plaintiff,                       Case No. 21- 10318

v.                                     HON. MARK A. GOLDSMITH

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

            Defendants.
_____/

**OPINION & ORDER**
**(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. 40) AND (2)**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 41)**

This matter is before the Court on Plaintiff Shean Satgunam, M.D.'s motion for summary

judgment (Dkt. 40) and Defendants' motion for summary judgment (Dkt. 41). For the reasons that

follow, the Court denies Satgunam's motion and grants Defendants' motion.[1]

**I. BACKGROUND**

Satgunam brings this action against the Department of Health and Human Services (HHS) and

the Secretary of HHS. It relates to the suspension of his clinical privileges by his former employer,

Michigan State University (MSU), which filed a report of that suspension with an online database

that HHS maintains. Satgunam twice requested that HHS remove the report from the database.

---

[1] Because oral argument will not aid the Court's decisional process, the motions will be decided
based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to
Satgunam's motion, the briefing includes Defendants' motion for summary judgment and attached
brief, which is titled "Brief in Support Defendants' Motion for Summary Judgment and Response
to Plaintiff's Motion for Summary Judgment" (Dkt. 41), and Satgunam's reply in support of his
motion and response to Defendants' motion, filed as a single document (Dkt. 42).

The agency denied the requests, and Satgunam now seeks judicial review of those decisions under the Administrative Procedure Act (APA).

### A. Satgunam's Employment with MSU and Suspension of Privileges

Satgunam is a board-certified surgeon who was an assistant professor in MSU's College of Human Medicine and provided clinical services as part of the MSU HealthTeam, the entity that coordinates MSU professors and employees who provide healthcare in area hospitals. Administrative Record (AR) at 9, 380 (Dkt. 20).  In 2009, Dr. Marc Basson, the chairperson of MSU's Department of Surgery, hired Satgunam for a three-year appointment, to last through June 2012.  Id. at 34.  The United States Court of Appeals for the Sixth Circuit, in a case that Satgunam brought against several individuals at MSU who were involved in his suspension, summarized events that occurred during his time at MSU:

> First, in October 2010, one of Satgunam's patients died allegedly due to complications from laparoscopic bypass surgery.  The patient's estate brought a medical malpractice suit, and MSU settled the claim at a cost of $650,000.  [The MSU] HealthTeam peer-review criticized Satgunam's surgical technique.  Basson met with Satgunam several times during Fall 2010, persuading Satgunam to stop performing laparoscopic surgeries without formally sanctioning Satgunam.  However, despite Basson's request, Satgunam refused to undergo any training or mentoring program to improve his skills.  Then, in September 2011, Satgunam performed another laparoscopic surgery.  The patient died, again allegedly due to surgical error.  Satgunam agreed not to perform laparoscopic procedures during the peer-review process on the condition that HealthTeam would not report the adverse cases to the Data Bank.  Finally, in February 2012, another MSU physician sent Basson a letter complaining that Satgunam refused to take a patient referred to him for an appendectomy while Satgunam was on call.  Satgunam claimed the patient was the responsibility of a doctor previously on call.

 Satgunam v. Mich. State Univ., 556 F. App'x 456, 458–459 (6th Cir. 2014); AR at 381.  These events led the MSU Department of Surgery peer-review committee to review Satgunam's clinical performance over the previous 15 months.  AR at 307, 381.  In a report issued on February 22, 2012, the committee stated that it had identified "a pattern of adverse surgical outcomes" that

raised the committee's "concerns over patient safety and the surgeon's clinical competence." Id. at 307.

The next day, Basson met with Satgunam to discuss the review, and he informed Satgunam that he was moving for the suspension of Satgunam's clinical privileges. Id. at 83, 381. The matter was sent to the MSU HealthTeam credentials and privileges committee, which treated it as a summary suspension. Id. at 104, 382.[2] In a letter dated February 27, 2012, the chair of the MSU HealthTeam credentials and privileges committee informed Satgunam that MSU's Chief Executive Officer and Board designee reviewed and approved the suspension and that, as a result, he was suspended from all clinical activity within the MSU HealthTeam. Id. at 86.

The chair's letter reported that the Department of Surgery had reviewed his clinical performance over the past 15 months and that it had identified adverse outcomes that included a death related to a bariatric surgery, morbidities related to 23 bariatric surgeries, and two patient deaths following ventral herniorrhaphy surgeries. Id. The letter also cited his negative interaction with a senior departmental surgeon and his refusal to perform an urgent procedure on a patient during his on-call shift. Id. It informed him that he could appeal the committee's decision, stating that "[a]rrangements are in process to afford you this right of appeal. You will be notified of the date, time, and location for this meeting." Id.

On March 8, 2012, the MSU HealthTeam Governing Board heard Satgunam's appeal of his suspension. Id. at 383. Following the hearing, it affirmed the suspension. Id.

---

[2] Under the MSU HealthTeam's provider credentialing and privileging policy, a summary suspension can be invoked for specific reasons, which include: immediate threat to patient safety, the State of Michigan's suspension or limitation of a provider's license, felony conviction, a provider's impairment, ethical misconduct, or a provider's removal from practice. AR at 287.

**B.  The Health Care Quality Improvement Act and the National Practitioner Data Bank**

On March 19, 2012, MSU submitted a report of Satgunam's suspension of privileges to the National Practitioner Data Bank (NPDB).  Id. at 1–2; NPDB Report (Dkt. 40-1).  The NPDB is an online depository of records and reports about physicians' competence and conduct that the Secretary of HHS maintains.  See 42 U.S.C. § 11134; 45 C.F.R. § 60.1.  It serves to "alert hospitals and other would-be employers of potential issues with [a] physician's credentials."  Long v. HHS, 422 F. Supp. 3d 145, 145–146 (D.D.C. 2019); see also Leal v. Sec'y, HHS, 620 F.3d 1280, 1284 (11th Cir. 2010) (explaining that the NPDB assists "hospitals and other health care entities in conducting extensive, independent investigations of the qualifications of the health care practitioners they seek to hire, or to whom they wish to grant clinical privileges").  Under the Health Care Quality Improvement Act of 1986 (HCQIA), if qualifying health care entities take "a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days," they must report that action to the NPDB.  42 U.S.C. § 11133(a)(1)(A); see also 45 C.F.R. § 60.12(a)(1) (describing statutory reporting requirements).

Congress passed the HCQIA "to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior."  Matthews v. Lancaster Gen. Hosp., 87 F.3d 624, 632 (3d Cir. 1996); see also 42 U.S.C. § 11101.  It identified a need to address the nationwide problem of medical malpractice and to "restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance."  42 U.S.C. § 11101(1)–(2).

To remedy those issues, the HCQIA prescribes mandatory reporting requirements for health care entities, see id. §§ 11131–11133, and grants liability protections to participants in professional

peer review actions, id. § 11111(a)(1).  The HCQIA authorizes the Secretary of HHS to establish the NPDB "to collect and release certain information relating to the professional competence and conduct" of physicians.  45 C.F.R. § 60.1.  NPDB reports are confidential and "may be accessed only by permitted entities, and by health care providers who may self-query."  Satgunam, 556 Fed. App'x at 460 n.2.

Federal regulations promulgated in accordance with the HCQIA "establish procedures to enable individuals . . . to dispute the accuracy of NPDB information."  45 C.F.R. § 60.2.  Under those regulations, a physician who is the subject of a report can seek Secretarial review of the report.  Id. § 60.21.  "Because information in the Data Bank is intended only to fully notify the requesting hospital of disciplinary action against a physician and the charges on which that action was based, the Secretary's review of information in the Data Bank is limited in scope."  Leal, 620 F.3d at 1284; see also Satgunam, 556 F. App'x at 464 ("The Secretary's power to review Data Bank reports is limited.").  Federal regulations and the NPDB Guidebook, a policy manual that HHS publishes to inform the healthcare community about the NPDB and its requirements, specify what the Secretary can review when a physician disputes a report.  45 C.F.R. § 60.21(c)(1); NPDB Guidebook at A-7 (Oct. 2018).

The Secretary can review (i) whether the report is factually accurate and (ii) whether a report was submitted in accordance with the NPDB's reporting requirements, including the eligibility of the entity to report the information to the NPDB.  NPDB Guidebook at F-5; Satgunam, 556 F. App'x at 464–465 (noting that, while the HCQIA's implementing regulations provide only that a physician may dispute the accuracy of a report and do not expressly cover challenges to reporting authorization, the NPDB Guidebook indicates that the Secretary reads the regulations to provide for agency review of that issue); National Practitioner Data Bank for Adverse Information on

Physicians and Other Health Care Practitioners: Reporting on Adverse and Negative Actions, 75

Fed. Reg. 4656-01, 4671 (Jan. 28, 2010) (stating that HHS has the statutory authority to review if

the report is legally required or permitted to be filed).

A review for factual accuracy determines "[w]hether the report accurately depicts the action

taken as reflected in the written record provided by the reporting entity" and "[w]hether the

reporter's basis for the action is reflected in the written record provided by the reporting entity."

NPDB Guidebook at F-5; see also § 60.21(b)(3) (stating that the physician who is the subject of a

report "may request that the Secretary review the report for accuracy").  In conducting such a

review, the Secretary has an obligation to verify that "the report accurately describes the adverse

action that was taken against the physician and the reporting [entity's] explanation for the action,

which is the [entity's] statement of what the physician did wrong."  Leal, 620 F.3d at 1284.

The Secretary, however, "will not consider the merits or appropriateness of the action or the

due process that the subject received."  45 C.F.R. § 60.21(c)(1); see also NPDB Guidebook at F-5

(stating that the review process does not include review of "[t]he extent to which entities followed

due process procedures; due process issues must be resolved between the subject of the report and

the reporting entity").  Accordingly, the agency "does not act as a factfinder deciding whether

incidents listed in the report actually occurred or as an appellate body deciding whether there was

sufficient evidence for the reporting hospital to conclude that those actions did occur."  Leal, 620

F.3d at 1284.  For example, while HHS would have no duty to determine whether a health care

entity "acted correctly in suspending a doctor," it would be required to "review whether the entity

in fact suspended the doctor," as indicated in the report.  Simpkins v. Shalala, 999 F. Supp. 106,

111 (D.D.C. 1998).

After reviewing the report, the Secretary may revise or void the report if he or she determines that the report is inaccurate or that the adverse action was not reportable.   45 C.F.R. § 60.21(c)(2)(ii), (iv).

**C.  Case Against Individuals at MSU**

In March 2012, Satgunam filed a 42 U.S.C. § 1983 action in the United States District Court for the Western District of Michigan against Basson and individual members of the MSU HealthTeam Governing Board and the MSU HealthTeam.  Satgunam v. Mich. State Univ., et al., 12-cv-00220 (W.D. Mich. 2012); see also AR at 380, 383.  He alleged that these individuals violated his due process rights through the hearing process that they used to terminate his staff privileges and erroneously reported his termination to the NPDB.  AR at 380. That case figures prominently in Satgunam's challenge here to HHS's action.

In that earlier federal court case, he filed a motion for preliminary injunction, seeking an order requiring the defendants to expunge the report made to the NPDB.  Id. at 101.  Defendants seemed to concede that they deprived Satgunam of property without due process, but they argued that he was unlikely to succeed on the merits of his claim because he had not exhausted the procedures for Secretarial review of the report under the HCQIA and its implementing regulations.  Id. at 107–108.  The Hon. Paul Maloney found that Satgunam was likely to succeed on his claim that the procedures the defendants provided to him, both before the suspension and in his later appeal, were deficient and lacked due process.  Id. at 107–109.  He ordered the Governing Board to reconvene for another hearing on the termination of clinical privileges and specified the procedural safeguards the Governing Board must use, including transcription by a court reporter, prompt written findings of fact by the Governing Board, the right for Satgunam to be present to hear the evidence, and the ability to cross-examine witnesses.  Id. at 116–117.  However, he declined to

order removal of the report.  On February 20, 2013, the Governing Board conducted a second appeal hearing in compliance with the injunctive order and upheld the suspension.  Id. at 384.

Later in the case, Judge Maloney found that the first appeal hearing deprived Satgunam of procedural due process, noting that he was given only 30 minutes to present his case to the Governing Board, that he was not permitted to call or cross-examine witnesses, that his counsel was allowed to attend the hearing but not allowed to speak, and that he was not allowed to hear the evidence that Basson presented against him.  Id. at 515–516.

The court held a jury trial in November 2016 to determine whether Satgunam was entitled to punitive damages against three individuals involved in the suspension: (i) Basson, (ii) the CEO of the MSU HealthTeam, and (iii) MSU's provost.  Id. at 477–478, 514.  According to the jury verdict form, the jury found that the conduct of all three defendants "was motivated by evil motive or intent, or that it reflected reckless or callous indifference to [Satgunam's] due process rights."  Id. at 477–478.  It awarded Satgunam $100,000 in punitive damages.  Id.

### D.  HHS Review of the Report

While the case before Judge Maloney was ongoing, Satgunam also sought Secretarial review of the report.  On December 16, 2013, he filed with HHS a memorandum and request for dispute resolution, requesting that HHS void the report and remove it from the NPDB.  Id. at 2, 455–466.  On February 23, 2015, HHS issued a decision denying his request.  Id. at 468–475.  After the jury trial, Satgunam filed a memorandum and request for reconsideration of HHS's prior dispute resolution decision, contending in part that the jury verdict required removal of the report from the NPDB.  Id. at 653.  HHS issued a decision denying the request for reconsideration.  Id. at 653–657.

Satgunam then filed this action, alleging that HHS's actions in refusing to remove the report of his suspension from the NPDB were arbitrary and capricious and violated the APA.  Compl. ¶¶ 15, 20, 53–59.  He has filed a motion for summary judgment, as have Defendants.

## II. STANDARD OF REVIEW

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The scope of review under the arbitrary and capricious standard is "narrow," and a court cannot substitute its judgment for that of the agency.  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1982).  But the agency must "examine the relevant data" and articulate "a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Id. (punctuation modified).  "At base, arbitrary and capricious review functions to ensur[e] that agencies have engaged in reasoned decisionmaking."  Atrium Med. Ctr. v. HHS, 766 F.3d 560, 567 (6th Cir. 2014) (punctuation modified); see also Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.").

In reviewing whether the agency's action was arbitrary and capricious, courts consider the following:

> [whether the agency] has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Atrium Med. Ctr. v. HHS, 766 F.3d at 567.  While the court "may not supply a reasoned basis for the agency's action that the agency itself has not given," it will "uphold a decision of less than

ideal clarity if the agency's path may reasonably be discerned." Bowman Transp. Inc. v. Ark.-Best Freight Sys., 419 U.S. 281, 285–286 (1974); see also Conax Fla. Corp. v. United States, 824 F.2d 1124, 1128 (D.C. Cir. 1987) (explaining that the court must determine not whether the agency might have reached a different decision if it had considered additional evidence, but only "whether the decision [it] did reach, based on the evidence that was before [it], was unreasonable").

Under the APA, an agency's factual findings must be supported by substantial evidence in the record as a whole. 5 U.S.C. § 706(2)(E); Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin., 711 F.3d 662, 667 (6th Cir. 2013). "Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (punctuation modified).

In deciding an APA case, the question of whether the agency acted in an arbitrary and capricious manner is a legal one that the district court resolves on the basis of the administrative record. Alliance for Cmty. Media v. FCC, 529 F.3d 763, 786 (6th Cir. 2008).

### III. ANALYSIS

Satgunam argues that HHS's conclusion that there was no basis for voiding the report was arbitrary and capricious for three reasons. Pl. Mot. for Summ. J. at 11–22. First, MSU is not an eligible reporting entity. Id. at 11–14, 16–18; Reply at 2–8. Second, MSU's actions were not motivated by professional competence or conduct concerns; therefore, these actions cannot form the basis of a professional review action, and the report was inaccurate as submitted. Pl. Mot. for Summ. J. at 18–19; Reply at 8–9. Third, MSU did not grant him clinical privileges. Pl. Mot. for Summ. J. at 19–22; Reply at 9–10. The Court addresses each argument in turn. It finds that HHS

reasonably concluded that MSU's report met the applicable reporting requirements and that there was not a basis to void the report.

### A.  HHS Reasonably Concluded that MSU Is an Eligible Reporting Entity

Satgunam first contends that HHS should void the report because, contrary to HHS's conclusion, MSU is not an eligible reporting entity.  Pl. Mot. for Summ. J. at 11–14, 16–18; Reply at 2–8.

The HCQIA states that "each health care entity" that takes a professional review action that adversely affects a physician's clinical privileges for longer than 30 days must report that action to HHS.  42 U.S.C. § 11133(a)(1)(A).  The statute defines "health care entity" as "an entity (including a health maintenance organization or group medical practice) that provides health care services and that follows a formal peer review process for the purpose of furthering quality health care (as determined under regulations of the Secretary)."  Id. § 11151(4)(A)(ii).  The statute's implementing regulations define "formal peer review process" as "the conduct of professional review activities through formally adopted written procedures which provide for adequate notice and an opportunity for a hearing."  45 C.F.R. § 60.3.

The Court proceeds by assessing the different aspects of HHS's decision that MSU was an eligible reporting entity and Satgunam's challenges to that decision as arbitrary and capricious.

### 1.  Jury Verdict and Court Determinations About Procedural Due Process

Satgunam asserts that, when MSU suspended him, it did not follow a formal peer review process that provided him adequate notice and an opportunity for a hearing.  Pl. Mot. for Summ. J. at 11–14, 16–18; Reply at 2–8.  He argues that two facts show that MSU failed to follow a formal peer review process in the course of his suspension: (i) defendants' concessions and the court's determination in his earlier federal court case that his appeal hearing did not provide him adequate

procedural due process and (ii) the jury verdict awarding him punitive damages in that case. Pl. Mot. for Summ. J. at 11–14, 16–18; Reply at 2–8. Because MSU did not follow a formal peer review process, he states, it did not act as a "health care entity" when it suspended him and reported the suspension to the NPDB. Pl. Mot. for Summ. J. at 11–14, 16–18; Reply at 2–8. Therefore, it was not an eligible reporting entity. Pl. Mot. for Summ. J. at 11–14, 16–18; Reply at 2–8. According to Satgunam, the jury verdict, defendants' concessions, and court determinations in his earlier federal court case show that HHS's finding that MSU was an eligible reporting entity is contrary to the evidence. Pl. Mot. for Summ. J. at 13–18.

In denying the request to remove the report from the NPDB, HHS set forth the definition of "health care entity" and determined that MSU satisfied this definition. AR at 472. It found that, when the suspension occurred, the MSU HealthTeam had formally adopted written procedures for peer review in place. Id. at 472, 655. As evidence, the agency cited the following documents that MSU provided in response to HHS's request for information about the suspension: (i) the MSU HealthTeam's peer review policies, see id. at 269–275; (ii) MSU's Department of Surgery peer review policies, see id. at 277–281, and (iii) the MSU HealthTeam's provider credentialing and privileging policy, see id. at 283–287. Id. at 472, 655.

HHS took the position that the jury verdict in the Western District case raised issues of due process. Id. at 655. It found that Satgunam's contention that MSU did not follow its formal peer review process or provide for adequate notice and an opportunity for a hearing during his suspension likewise "describe[d] inadequacies of MSU HealthTeam's due process mechanisms." Id. Therefore, it stated, Satgunam's arguments that the jury verdict compelled removal of the report and that, in suspending him, MSU violated its formal written procedures were outside the scope of review. Id. at 472, 655. In HHS's view, it was not authorized to review the events that

12

occurred and determine whether those events complied with the formal procedures governing them. Id. at 473. Nor was it authorized to review whether the notice and opportunity for a hearing in Satgunam's circumstances were adequate. Id. at 655–656. Instead, it was authorized to review the report to determine only "(1) whether the action is reportable to the NPDB under applicable law and (2) whether the Report accurately describes the reporter's written records." Id. at 655. Therefore, it could "contend [only that] there are written procedures for a peer review process," id. at 656, and "[w]hether . . . [the] MSU HealthTeam adhered to their formal procedures and violated these procedures during the professional review process are matters that [Satgunam] must resolve directly with them," id. at 472. According to HHS, the record showed that MSU suspended Satgunam's privileges and upheld its decision. Id. at 656. Thus, MSU was required to submit the report to the NPDB. Id.

HHS reasonably concluded that Satgunam's arguments raised issues of due process and, therefore, were beyond the scope of its review. Satgunam's contention that MSU is not an eligible reporting entity is in fact centered on due process. In asserting that MSU did not follow a formal review process and was, therefore, ineligible to report his suspension, he relies on (i) a court's determination that his first appeal hearing deprived him of procedural due process protections and (ii) a jury award of punitive damages based on three individuals' role in depriving him of those protections.

Yet consideration of due process issues is explicitly excluded from the Secretary's review. Federal regulations that govern the review process state that the Secretary "will not consider the merits or appropriateness of the action or the due process that the subject received." 45 C.F.R. § 60.21(c)(1). Similarly, the NPDB Guidebook, which courts have examined in assessing how the Secretary reads regulations governing the NPDB, see Satgunam, 556 F. App'x at 464–465, states

13

that the review process "does not include reviewing" "[t]he extent to which entities followed due process procedures" and "does not "examine . . . how [practitioners] are afforded due process." NPDB Guidebook at F-5.  Rather, it emphasizes, "due process issues must be resolved between the subject of the report and the reporting entity." Id.  Therefore, HHS reasonably determined that, in assessing whether MSU is an eligible reporting entity, it could determine only whether MSU had in place formal written procedures that provided for peer review and could not review the jury verdict or the extent to which MSU provided adequate notice and a hearing in the case of Satgunam's suspension.

Satgunam takes issue with HHS's determination that his arguments were outside the scope of its review.  He states that he did not ask HHS to perform an independent analysis of the due process MSU provided him regarding his suspension, which would have been excluded from its review. Pl. Mot. for Summ. J. at 14–15.  Instead, he contends, through the jury verdict and the concessions MSU made in the Western District case, it was already an established fact that he was not provided adequate due process when he was suspended.  Id.  He maintains that he simply asked HHS to take notice of this fact, and HHS ignored it.  Id. at 15.  But even if it were settled that the first appeal hearing did not provide adequate due process, asking the Secretary to take notice of the court's rulings and jury verdict establishing this fact is asking the Secretary to "consider" the due process that he received.  And the Secretary cannot "consider" the due process that a physician received as part of the review.  See 45 C.F.R. § 60.21(c)(1).

In another effort to show that the Secretary's failure to consider the jury verdict as part of its finding that MSU was an eligible reporting entity was arbitrary and capricious, Satgunam states that the extent to which a reporting entity followed due process procedures would be outside the scope of review if he were using arguments about due process to challenge the factual accuracy of

14

the report.  Reply at 6–7.  Instead, he states, he is using due process as a basis to contend that MSU was not an eligible reporting entity, and the review process can determine whether an entity is eligible to report the information at issue to the NPDB.  Id. (citing NPDB Guidebook at F-5).

Satgunam is correct that, according to the NPDB Guidebook, the review process can determine "[w]hether a report was submitted in accordance with NPDB reporting requirements, including the eligibility of the reporting entity to report the information to the NPDB."  NPDB Guidebook at F-5.  However, neither the Guidebook nor any regulation states that there is an exception to the lack of consideration of due process when a physician challenges the eligibility of a reporting entity, or that the lack of consideration of due process applies only when a physician challenges the factual accuracy of the report.  In fact, the same page of the Guidebook that Satgunam cites states, without qualification, that the review process "does not include reviewing" the extent to which entities followed due process procedures.  Id.

In addition, the jury verdict does not show that HHS's conclusion that MSU is an eligible reporting entity was contrary to the evidence.  The jury found that Satgunam was entitled to punitive damages because three individuals at MSU reflected at least reckless or callous indifference to his due process rights.  The court found that the first appeal hearing failed to afford him sufficient procedural due process.  The jury and the court did not determine whether MSU followed a formal peer review process for the purposes of NPDB reporting, which was the issue before HHS.  Defendants assert that an analysis of Satgunam's due process rights under the federal constitution does not answer the question of whether MSU followed a formal peer review process under NPDB reporting requirements, as determined by the HCQIA and its implementing regulations.  The Court agrees.  Further, the jury verdict focused on the conduct of three individuals at MSU who were involved in the suspension, but HHS was tasked with determining whether

MSU, as an entity, was eligible to report the suspension.  HHS did not unreasonably decline to consider what due process Satgunam received when it determined that MSU was an eligible reporting entity.

### 2.  Reliance on Definitions in the HCQIA's Section on Liability Protection

Satgunam offers another argument as to why HHS arbitrarily and capriciously concluded that MSU was an eligible reporting entity.  He asserts that "adequate notice" and an "opportunity for a hearing" are defined in 42 U.S.C. § 11112(b), and MSU's procedures did not satisfy these statutory definitions.  Pl. Mot. for Summ. J. at 8, 12–14.

However, this argument relies on a subchapter of the HCQIA that is not applicable here. Section 11112(b) falls under subchapter I of the HCQIA, which outlines standards that health care entities must follow to receive liability protections.  See 42 U.S.C. §§ 11112–11115.  One of those standards is that the professional review action be taken "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances."  Id. § 11112 (a)(3).  The NPDB reporting requirements, which are the focus of this case, fall under subchapter II of the statute.  See 42 U.S.C. §§ 11131–11133.

HHS discussed the distinction between these two parts of the statute in its first decision denying the request to void the report.  According to HHS, "there is no requirement" in subchapter II that, to be reportable, an adverse action be taken in accordance with the due process standards in subchapter I.  AR at  472–473.  Thus, the degree to which an entity follows due process standards "has no bearing on whether a [r]eport should be filed"—and whether a report of the suspension should have been filed is what HHS was obligated to review.  Id.

Accordingly, the agency offered an explanation for its decision that the extent to which MSU provided Satgunam adequate notice and an opportunity for a hearing did not impact whether it

submitted the report in accordance with NPDB reporting requirements.  And, as the statutory language indicates, that decision was reasonable.  See 42 U.S.C. § 11112(a) ("For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken . . . after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances"); id. § 11111(a) ("If a professional review action . . . of a professional review body meets all the standards specified in section 11112(a) of this title . . . [participants in professional review actions] . . . shall not be liable in damages under any law of the United States or of any State"); see also Long, 422 F. Supp. 3d at 148 n.1 (rejecting in dicta plaintiff's argument that NPDB report should be voided because, before issuing the report, a hospital did not provide him a hearing, as required by 42 U.S.C. § 11112(b)).

### 3. Whether MSU Had a Formal Peer Review Process in Place at the Time of the Suspension

While HHS stated that it could not determine some of the issues that Satgunam raised, the determination that it did make—that, at the time of suspension, MSU retained formally adopted written procedures for peer review that provided for adequate notice and an opportunity for a hearing—was reasonable.  The MSU HealthTeam's peer review policies, MSU's Department of Surgery peer review policies, and the MSU HealthTeam's provider credentialing and privileging policy, which HHS relied on in reaching its conclusion, all indicate that MSU had written procedures that established a formal peer review process.[3]

---

[3] See AR at 269 (stating within the MSU HealthTeam peer review policies that those policies are "intended to provide a framework for conducting peer review in the HealthTeam (HT) that provides the maximum benefits of peer review with the goal of improving patient care and systems of care"); id. at 277 (stating in the MSU Department of Surgery peer review policies: "The Department of Surgery will conduct Peer Review to evaluate care rendered by faculty surgeons. A Department Peer Review Committee consisting of three surgeons will convene monthly (or

These policies contain provisions regarding notice.  The provider credentialing and privileging policy provides for notification when a provider is subject to a review for a non-summary suspension of privileges.  It states that the provider will receive notice of the content of the request for review, the cause for review, the date of the review, and the provider's right to appear at the review.  AR at 287.  After the review, the credentials and privileges committee chair will notify the provider of the results and any follow-up action.  Id.  When a provider has privileges summarily suspended, the credentialing coordinator will immediately notify the provider of the suspension. Id.

The policies also set out a process for appeals, which allows for a hearing, as in fact occurred in Satgunam's case.  For instance, MSU's Department of Surgery peer review policies state that a reviewed practitioner "[m]ay appeal the findings or action plan to the Department Peer Review Committee."  Id. at 279.  And the provider credentialing and privileging policy provides that when a provider receives notice of an action affecting their clinical privileges, the provider is entitled to an appeal of the action before the MSU Governing Board, which makes the final decision.  Id. at 287.

In examining the above policies and concluding that they show that MSU conducted professional review activities through formally adopted written procedures that provided for adequate notice and an opportunity for a hearing, HHS "examine[d] the relevant data" and articulated "a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Motor Vehicle Mfrs. Ass'n., 463 U.S. at 43.

---

more frequently as needed) to review known adverse events, adverse clinical outcomes, quality related reports, closed claims, or complaints of improper care."); id. at 286 (stating in the MSU HealthTeam provider credentialing and privileging policy: "In the course of providing healthcare[,] circumstances may arise that require a review and evaluation of a provider[']s practice relative to practice standard.  This could result in: Peer review activity.").

Satgunam has failed to establish that HHS was arbitrary and capricious in determining that MSU was an eligible reporting entity.

**B. HHS Reasonably Determined that MSU's Suspension was Based on Concerns of Competence and Conduct**

Satgunam next argues that the report should be voided because MSU's actions were not motivated by professional competence or conduct concerns. Pl. Mot. for Summ. J. at 18–19; Reply at 8–9. He states that, because MSU did not suspend him on the basis of professional competence or conduct, the report was not accurate as submitted, and the suspension does not meet the HCQIA's definition of "professional review action." Pl. Mot. for Summ. J. at 18–19; Reply at 8–9 (citing 42 U.S.C. § 11151(9) (defining "professional review action" as "an action or recommendation of a professional review body . . . which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients)"); id. § 11151(9)(E) (excluding from this definition an action "primarily based on . . . any other matter that does not relate to the competence or professional conduct of a physician")).

HHS addressed these arguments in its second decision denying Satgunam's request to void the report. It found that the record showed that all of the reasons the MSU HealthTeam gave for the suspension related to professional conduct and competence. AR at 656. For support, it quoted the February 27, 2012 letter that the chair of the MSU HealthTeam credentials and privileges committee sent to Satgunam informing him that his clinical privileges were summarily suspended. Id. The letter reported that the Department of Surgery's review of his clinical performance over the past 15 months "revealed adverse outcomes" including: death related to a bariatric surgery, morbidities related to 23 bariatric surgeries, and two post-operative deaths after ventral herniorrhaphy surgery. Id. According to HHS, because the report reflected the record's showing

that MSU suspended Satgunam's clinical privileges based on professional competency, the report was accurate as submitted.  Id.

HHS's conclusion that Satgunam was suspended for reasons of professional competence and conduct is supported by substantial evidence.  The record shows that the events identified in the letter led the MSU Department of Surgery to conduct a peer review and, following that review, to conclude in a report that Satgunam "demonstrated a pattern of clinical practice that has very troubling implications for patient safety and raises grave concerns regarding patient care."  Id. at 307, 381.  A letter that Basson sent to Satgunam the day after he informed Satgunam that he was moving for the suspension of clinical privileges reported that the peer review accorded with his "strong sense . . . that serious competency issues existed."  Id. at 83.  Basson referred to his "overriding patient safety concerns" and stated that he moved for the suspension of privileges due to "the pattern of technical performance problems, some having tragic outcomes," and the "disturbing level of risk for patients."  Id. at 84.  When the MSU Governing Board upheld the suspension after the second appeal hearing, it "unanimously decided that the preponderance of the evidence suggested that the pattern of clinical practice did indeed pose an immediate threat to patient safety, and that summary suspension was proper."  Id. at 239.  A reasonable mind could easily accept this evidence as "adequate to support" HHS's conclusion that Satgunam's suspension was based on MSU's concerns about his professional competence and conduct.  See Biestek, 139 S. Ct. at 1154.

To the extent that Satgunam argues that the report was not accurate as submitted, the information in the letter that HHS cited is consistent with MSU's report.  The report that MSU filed with the NPDB stated that Satgunam's clinical privileges were suspended due to "substandard or inadequate care," and the reasons it listed for the suspension included Satgunam's

comparatively high rates for mortality and morbidity related to bariatric surgeries, comparatively high rates for ventral herniorrhaphy, the fact that he declined employer-provided retraining and reeducation, a negative interaction with a senior departmental surgeon, and his refusal to perform a procedure during an on-call shift.  NPDB Report.  The adverse surgical outcomes identified in the report are the same as those contained in the letter informing Satgunam of his summary suspension and the events prompting the suspension.  "The consistency between [MSU's] letters and its report to the Data Bank establishes the report's factual accuracy in the only sense that matters under the Act."  Leal, 620 F.3d at 1284.  Since the Report reflects the record, it is accurate as submitted.  See id.  Therefore, HHS reasonably concluded that the NPDB report was factually accurate as submitted.  Id.

Satgunam again contends that HHS failed to consider the jury verdict in the Western District case, which he maintains determined that "MSU's actions, via its authorized state actors, were motivated by evil motive and intent rather than any professional competence or conduct concerns or interest in furthering quality of health care."  Reply at 8–9.  But the jury did not determine whether MSU had concerns about Satgunam's clinical competency and conduct and suspended him to protect patient safety.  As Defendants note, the fact that a jury found that three individuals were at least recklessly indifferent to his due process rights does not mean that these individuals— or all of the individuals at MSU involved in the suspension—were not motivated by what they deemed to be inadequacies in his professional competence or conduct.

Accordingly, HHS reasonably rejected the argument that the jury would not have awarded him punitive damages if the suspension met the statutory definition of "professional review action." AR at 656.[4]

## C.  HHS Reasonably Determined that MSU Granted Clinical Privileges

Satgunam also argues that the report of his suspension should be voided because MSU did not grant him clinical privileges and, therefore, did not take a professional review action that had to be reported to the NPDB.  Pl. Mot. for Summ. J. at 19–21; Reply at 9–10.

In its second decision denying his request to void the report, HHS found that Satgunam had clinical privileges and had exercised them since the beginning of his three-year appointment at MSU in 2009.  AR at 656.  For support, it cited a February 11, 2014 letter that MSU sent to HHS in response to HHS's request for information about the suspension.  Id.  In addition, it noted that he had furnished medical care by performing several bariatric surgeries and that the complications of these surgeries prompted the suspension.  Id.  It then concluded that, consistent with the regulations governing the NPDB, MSU was legally required to submit the report.  Id.

---

[4] Satgunam also asserts that HHS simply accepted MSU's conclusory statements without further analysis of relevant evidence.  Pl. Mot. for Summ. J. at 18–19.  In support of his argument that HHS failed to properly evaluate the evidence before it, he analogizes his case to Simpkins v. Shalala, 999 F. Supp. 106 (D.D.C. 1998) and Costa v. Leavitt, 442 F. Supp. 2d 754 (D. Neb. 2006), in which courts found that the Secretary's decision to include reports in the NPDB was arbitrary and capricious.  In those cases, however, the court's review of the record showed that the record did not support the agency's decision.  The record revealed either that a certain event was not reportable, see Simpkins, 999 F. Supp. at 115–116, or that there was no rational basis for the agency's conclusion that a report was accurate as submitted, see Costa, 442 F. Supp. at 773.  Here, the record supports HHS's determination, and the evidence that Satgunam contends the agency overlooked—the jury verdict—does not undermine that determination.  Further, HHS's citation to the letter, followed by its conclusion that the report was accurate, does not indicate that HHS merely accepted MSU's conclusory statements without evaluating the evidence.  The statements in the letter were a product of a peer review conducted by several individuals at MSU, and the letter itself is corroborated by numerous documents in the record.

The record supports the agency's finding that MSU granted Satgunam clinical privileges as the HCQIA defines the term.  Under the statute, clinical privileges are "privileges, membership on the medical staff, and the other circumstances pertaining to the furnishing of medical care under which a physician or other licensed health care practitioner is permitted to furnish such care by a health care entity."  42 U.S.C. § 11151(3).  Several pieces of evidence in the record support a finding that there were "circumstances pertaining to the furnishing of medical care" under which MSU "permitted" Satgunam to "furnish such care."  Id.  The MSU HealthTeam's provider credentialing and privileging policy requires all providers employed by MSU to successfully complete the "privileging" process as a condition of their employment, and it defines "privileging" as "the process by which the specific scope and content of patient care services (clinical privileges) are authorized for a provider."  AR at 283.  Satgunam's employment contract stated that his employment was contingent on "obtaining medical staff privileges through the MSU HealthTeam at Michigan State University."  Id. at 597.  Consistent with these statements, the court's opinions in the Western District of Michigan case, to which Satgunam repeatedly refers in support of his due process arguments, characterized MSU's action as a suspension of clinical privileges.  See id. at 123.

Satgunam again asserts that HHS did not offer a satisfactory explanation for its decision and simply accepted MSU's conclusory letter stating that he was given privileges.  But HHS articulated a rational connection between the facts found and its decision, and the letter it cited does not contain mere conclusory statements.   Rather, the letter, which also includes supporting documentation that HHS requested, explains that MSU hired Satgunam for a three-year appointment in 2009 and that, through this appointment, he furnished medical care that included performing surgeries.  Id. at 33–34.  It then describes concerns about the outcomes of these

23

surgeries and resulting suspension.  Id.  The letter's supporting documentation includes the February 24, 2012 letter from Basson to Satgunam, which stated that Basson "was moving for the suspension of [Satgunam's] clinical privileges."  Id. at 83; see also id. at 471 (listing the supporting documentation for the February 11, 2014 letter from MSU to HHS).  The supporting documentation also includes the February 27, 2012 letter from the credentials and privileges committee chair to Satgunam, informing him that the CEO and Board designee approved the "recommendation of a summary suspension of [his] clinical privileges" and that, "as a result, [he was] suspended from all clinical activity within MSU HealthTeam."  Id. at 86.  Thus, the evidence that HHS relied on shows that one could reasonably conclude that MSU granted Satgunam clinical privileges.  While the agency's explanation for its decision was brief, its path for reaching this decision can "reasonably be discerned," Bowman Transp. Inc., 419 U.S. at 286, and a court "may uphold an agency's reasoning even where it is articulated only briefly and in a somewhat conclusory fashion," Long, 422 F. Supp. 3d at 150 (punctuation modified).

Satgunam, however, asserts that HHS failed to consider the following relevant evidence that demonstrates that MSU did not provide him clinical privileges: (i) the fact that the MSU bylaws do not authorize the granting of clinical privileges; (ii) the fact that, to perform surgery, he had to obtain clinical privileges at a Michigan hospital, which had its own medical staff privileging process separate from MSU HealthTeam; and (iii) the definition of clinical privileges from various accreditation agencies.  Pl. Mot. for Summ. J. at 20–21; Reply at 10.

But none of this shows that HHS's conclusion was contrary to the evidence.  As Defendants note, the fact that the MSU bylaws are silent on the issue of clinical privileges does not mean that MSU did not grant Satgunam clinical privileges, and nothing in the bylaws prohibits the granting of clinical privileges.  The separate requirement to maintain staff privileges at a Michigan hospital,

where he performed surgery, does not undermine a finding that MSU permitted him to furnish health care by performing surgery as part of his employment. And regardless of how various accreditation agencies define "clinical privileges," the issue before HHS was whether MSU granted clinical privileges as that term is defined by the HCQIA.

It was not arbitrary and capricious for HHS to conclude that, under the HCQIA's broad definition, MSU granted Satgunam clinical privileges.

### D. The Court Grants Defendants' Motion for Summary Judgment

The reasons supporting denial of Satgunam's motion for summary judgment also support awarding summary judgment to Defendants.

Satgunam does not refute that one party or the other should be awarded summary judgment. But he does raise an objection to Defendants' motion for summary judgment on a technical basis. Defendants filed a motion for summary judgment and a single brief in support of that motion and in opposition to Satgunam's summary judgment motion. Why Defendants filed their own motion is not clear, given that the Court and counsel, at a scheduling conference, agreed that the issues to be decided in the case could be framed with just a motion by Satgunam. Consistent with that understanding, the scheduling order that followed (Dkt. 39) provided for a motion only by Satgunam.

While the defense motion was not authorized, it was also not injurious to Satgunam's rights in any way. The defense motion did not raise any arguments separate and distinct from arguments offered in opposition to Satgunam's motion, as demonstrated by the single brief filed by Defendants. And Satgunam recognizes that Federal Rule of Civil Procedure 56(f) permits a court to award summary judgment to the non-moving party. Reply at 2.

Nonetheless, Satgunam urges striking or denying the motion, stating that by virtue of the "motion" moniker, he should have had more time to respond and a greater page allowance. However, Satgunam's reply used only 11 pages, four short of the full 15 pages allowed by the scheduling order. And it was filed four days early. So Satgunam has not been prejudiced in time or space.

Given that Defendants have demonstrated an entitlement to summary judgment, granting their motion for summary judgment will avoid any confusion on the docket that might result from an order striking or denying the motion of the prevailing parties. Accordingly, the Court grants the defense motion.

## IV. CONCLUSION

For the reasons set forth above, the Court denies Satgunam's motion for summary judgment (Dkt. 40) and grants Defendants' motion for summary judgment (Dkt. 41).

SO ORDERED.

Dated: March 31, 2023                         s/Mark A. Goldsmith
        Detroit, Michigan                      MARK A. GOLDSMITH
                                               United States District Judge